Kelton M. Williams
9117 San Andres St.
Spring Valley, CA 91977
619. 822. 8480
Kelton.MWilliams@gmail.com
Plaintiff in Pro Per

2012 DEC 28  AM 11: 41

BY_____ *w*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

'12 CV 3072 IEG BLM

| | |
|---|---|
| Kelton Williams,   an individual | Case No.: _____ |
| *Plaintiff,* | |
| | COMPLAINT FOR : |
| vs. | RETALIATORY DISCHARGE |
| | FMLA INTERFERENCE |
| American Specialty Health Group *dba* | FMLA RETALIATION |
| American Specialty Health Networks, Inc. | AND RELATED CLAIMS |
| a California Corporation, | |
| Kristin Bragg,     Human Resources | |
|                         Senior Director | **DEMAND FOR JURY TRIAL** |
| John Donoghue,   Vice-President | 2 U.S.C. § 1311, Title VII; |
| | FEHA § 12940(h)(i); |
| Cheryl Witt,        Manager | FMLA 29 U.S.C. § 2615(a)(1)(2); |
| | California Labor Code § 1102.5(b); |
| | California Civil Code § 43 |
| *Defendants.* | |

*Complaint  ~  1*

# I.   INTRODUCTION

1.     This is a complex civil action for violations of the federal statutes at 2 U.S.C. § 1311, Title VII 'Anti-Retaliation Provision,' Fair Employment and Housing Act § 12940(h)(i), Family Medical Leave Act, 29 U.S.C. § 2615(a)(1)(2), California Labor Code § 1102.5(b), retaliation, and California Civil Code § 43, defamation. The misconduct alleged in this Complaint transpired mainly in the city of San Diego, California ~ while offenses (in a related matter) were committed in Los Angeles and Elk Grove, California.

2.     The Plaintiff brings this Complaint against the Defendants Kristin Bragg, John Donoghue, Cheryl Witt, and American Specialty Health Group *dba* American Specialty Health Networks, Inc. ("ASH"), for their willful participation in an egregious pattern of retaliatory misconduct. The unlawful mistreatment suffered by the Plaintiff was subsequent to a formal filing of protest with the Human Resources Director, initially in 2009 (for racial discrimination involving the Plaintiff's manager).

3.     Plaintiff in the matter, Kelton Williams, was the victim of a sustained pattern of managerial mistreatment whose features included, among other things: severe and pervasive harassment by management-levels, a negative performance evaluation, coercion, inappropriate comments about his FMLA usage/status, managerial efforts to (directly) hinder monthly sales production, harangued by manager and H/R Sr. Director, ramped up performance standards upon return from FMLA excused absences, pretextual disciplinary meetings, heightened managerial surveillance, and termination with an 'impromptu' radio-laden security detail. These features were *not* apart of management's style before the formal protest registered by Mr. Williams in June, 2009.

4.     Furthermore, the pattern of retaliatory misconduct spanned a duration of time from June 2009 to the date of termination, December 8, 2010, whilst under FMLA protected status. Closer examination will yield (6) pivotal dates that hallmark the stages of retaliatory mistreatment exercised by Defendants Bragg, Donoghue, Witt, and the Human Resources Department, alleged herein. The misconduct by the Defendants was malicious, egregious, and applied methodically to inflict emotional distress.

5.     Given the extended duration of time (between the initial filing of formal protest to the date of termination) the Plaintiff will offer an alternative framework, in lieu of temporal proximity. In support of the allegations described herein, Plaintiff Williams will establish the retaliatory animus by the Defendants, as an adverse action by the 'totality of circumstances.'

*Complaint  ~   2*

6.      In a related matter, the misconduct described thus far is a subset of a larger series of unlawful misconduct by the employer, at-issue. Plaintiff Williams maintains that Defendant American Specialty Health (ASH) has engaged in further illegal activity including *inter alia*, collusion with state and federal agencies to circumvent the Plaintiff's fundamental right of access to the Courts. To further clarify, the Department of Fair Employment and Housing (DFEH) and the Equal Employment Opportunity Commission (EEOC) have worked in concert with Defendant ASH to prevent issuance of a legitimate DFEH closure letter (or 'right-to-sue'), specifically for retaliatory animus. As a result the entities find themselves under investigation by relevant agencies, upon suggestion of the United States Attorney's Office ~ Central District of California (August 2012).

7.      In spite of the exceptional circumstances of misconduct, Plaintiff Williams seeks to proceed with judicial redress against Defendant ASH for retaliatory animus, as described herein. Plaintiff will summarize the due diligence exercised to date, with efforts to procure the needed 'right-to-sue' letter. And offer rationale for consideration by the Court to apply the doctrine of equitable tolling in this matter.

8.      Nevertheless, the retaliatory misconduct by the Defendants has brought considerable harm or injury to the Plaintiff. As the direct and proximate cause, Plaintiff Williams has suffered and continues to suffer mental distress, emotional distress, depression, humiliation, embarrassment, anxiety, and pain

9.      As such, Plaintiff Williams brings this Complaint against the Defendants for remedies including declaratory and injunctive relief, general damages, front pay, compensatory damages, aggravated damages, liquidated damages, exemplary damages, and for any other relief which the Court deems just and proper; due to the circumstances alleged within this Complaint.

## II.   JURISDICTION

10.     The District Court, for the Southern District of California, has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Federal question jurisdiction arises pursuant to Title VII, 2 U.S.C. § 1311 and FMLA 29 U.S.C. § 2615(a)(1)(2). The Court has pendent jurisdiction and supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367. Declaratory relief is authorized under 28 U.S.C. §§ 2201 and 2202.

11.     By way of the Department of Fair Employment and Housing (DEFH) and the Equal Employment Opportunity Commission (EEOC), the Plaintiff exhausted efforts at administrative remedy, in accordance with state and federal law. A DFEH closure letter was obtained for 'discriminatory animus,' which expired in August 2012.

*Complaint ~ 3*

Diligent efforts were made by the Plaintiff to secure a DFEH closure letter for 'retaliatory animus' *prior* to the expiration date of the former; but was unsuccessful due to the exceptional misconduct of the DFEH and EEOC, under color of law. To date, the DFEH has yet to issue a compliant (or unaltered) 'right-to-sue' letter for retaliation, in accordance with various state/federal laws and both Constitutions.

## III.        VENUE

12.    The majority of the events giving rise to the claims in this cause of action transpired in the County of San Diego, California. Upon information and belief, all of the Defendants reside within the judicial district of this federal Court. As such, proper venue is the United States District Court for the Southern District of California, pursuant to 28 U.S.C. § 84(d) and 28 U.S.C. § 1391(b)(1)(2).

## IV.        PARTIES

13.    Plaintiff Kelton Williams ("**Williams**") is and was, at all relevant times mentioned within this Complaint, a citizen of the State of California and a resident of the County of San Diego. Mr. Williams is of African-American descent, and by outward appearance, a person of color. This is noteworthy, given the administrative complaint filings for (racial) discrimination and retaliation with relevant state/federal agencies.

14.    By many accounts, Plaintiff Williams maintains that he led (by success) the sales team of which he was apart of, until nearly the time of formal protest with the Human Resources Director. To further clarify, from Q1 of 2008 to Q2 of 2009, the Plaintiff was the top 'Recruiter' (salesperson) for the 'Fitness' team as evidenced by 12+ consecutive monthly awards for top-tier sales production; in addition to many unbroken sales records. Prior to June 2009, the Plaintiff was never called to H/R, save to pickup monthly awards for exemplary sales production.

15.    Though not a 'perfect' employee, Williams did his best to execute superior business need in spite of the discriminatory mistreatment, which was *reserved* for only the Plaintiff and the Team's Lead (the only African-American team members).

16.    As one of two senior-most employees, Williams was often relied upon by upper-management for procurement of high profile accounts in critical campaign areas for health plan clients. Regrettably, the aforementioned 'sales run' fostered much chagrin and resentment from management and the Executive Team, including the Vice-President alleged herein.

*Complaint ~ 4*

17.     Defendant Kristin Bragg ("**Bragg**") is the Senior Director, of the Human Resources Department at American Specialty Health (ASH). As such, Ms. Bragg was a willing orchestrator and protagonist of the retaliatory animus described herein. As the liaison between employees and the Executive Team, Defendant Bragg authorized the commission of an ongoing pattern of unlawful misconduct by relevant management – levels and even the H/R Department, at-issue in this Complaint. In this cause of action, Ms. Bragg is sued in both her official and individual capacities.

18.     In addition, Defendant Bragg utilized informally, policies and practices that were both egregious and unconscionable, and the proximate cause of the Plaintiff's injuries ~ physically, financially, and to property. Defendant Bragg was apprised continually (by the Plaintiff) regarding the discrimination and its adverse health impact, yet chose to exacerbate the specialist treatment with her personal tools of file-padding, harassment, and false implication. The misconduct was sanctioned by the Executive Team at American Specialty Health (ASH), in Robert White. Mr. White is the President and Chief Operations Officer at ASH. The Chief Executive Officer of ASH is George Devries.

19.     Defendant John Donoghue ("**Donoghue**") is the Vice-President, of Network Management at ASH. Mr. Donoghue was a willful participant and protagonist of the ongoing pattern of retaliatory animus - which included harassment (via emails, meetings), coercion, and even pretextual meetings for discipline. Defendant Donoghue is the management-level above manager, Cheryl Witt. The egregious misconduct was committed in furtherance of the overall objective – to make a public example and punish the Plaintiff for opposing discriminatory treatment. For purposes of this Complaint, Mr. Donoghue is sued in both his official and individual capacities.

20.     Defendant Cheryl Witt ("**Witt**") is the manager for Network Management at ASH, and the main protagonist of discriminatory and retaliatory misconduct, alleged herein. In this Complaint, Defendant Witt is sued in both her official and individual capacities. Ms. Witt was initially the manager of the 'Clinical' sales team at ASH. In mid-2007, Defendant Witt inherited the 'Fitness' sales team which included the Plaintiff and Team's Lead (who was promoted by the team's Director before Ms. Witt assumed the helm).

21.     From literally the *first* day of Defendant Witt's leadership of the Fitness team, she utilized a separate 'style of management,' reserved for African-American employees on either of her teams. To further clarify, the management style was even *more* discriminatory towards African-American males on the teams, irrespective of their skill sets or business acumen. The mistreatment meted out by Defendant Witt was malicious, wanton, and oftentimes in violation of the civil rights afforded by the

*Complaint  ~  5*

United States Constitution. This was a manager who literally ranked her subordinates' abilities by the 'color' of their skin.

22.    Upon Plaintiff Williams filing protest with the H/R Department in mid-2009, Defendant Witt ramped up the mistreatments with a fervor until the Plaintiff's date of discharge from ASH. This Complaint will focus specifically, however, on features of Ms. Witt's management-style that were *not* present before June, 2009.

23.    Defendant ASH ("**ASH**") is American Specialty Health Group, *dba* American Specialty Health Networks, Inc., a California corporation. As such, Defendant ASH directly or indirectly, authorized the commission of unlawful misconduct described within this Complaint and in forthcoming causes of action (beyond the scope of this Complaint). Furthermore, under the doctrine of 'vicarious liability,' the corporation is liable for the misconduct of its management-levels named herein. "An employer generally can be held liable for the retaliatory actions of its supervisors." [1]

24.    To underscore, ASH had <u>ample</u> season by which to correct and curtail the problem [manager Witt's sustained mistreatment of her African-American employees],....but instead chose retaliatory animus and the 'dark arts' of collusion and misdealing, with the DFEH/EEOC.

## V.    FACTS GIVING RISE TO CAUSE OF ACTION

*Preface*

25.    It is often difficult to ascertain the parameters of discrimination and retaliation, as the psychological animus for both are often intertwined. Thus, in the absence of such omniscience, one alternative is to identify managerial misconduct that was *not* commonplace before the formal protest to the discrimination. To that end, Plaintiff Williams will offer a brief summary of the 'backdrop of discrimination' that gave rise to the formal complaint (in June, 2009) to the H/R Senior Director, Defendant Bragg.

---

[1]   *Wysinger v. Automobile Club of So California* (2007), 157 Cal.App.4th 413; 69 Cal.Rptr.3d 1; Cal.App.LEXIS 1961 at 420

26.     As mentioned earlier, Defendant Witt utilized a highly subjective and often punitive style of management that was reserved for her sales teams' African - American members *only*. Williams had hoped that his 'sales run' during 2008 – 2009, would perhaps facilitate a transfer elsewhere in the company to escape the growing unconscionable mistreatment. Nothing was further from the truth.

27.     In a late December 2008 (1:1) meeting between Williams and Defendant Witt, the manager divulged that both she and the Vice-President, John Donoghue, had "poured through (William's) applications in excess of (40) minutes," looking for any evidence of impropriety. This is certainly not a standard practice in *any* sales environment; especially month (9) into a year+ sales run.

28.     The following January (2009), in a (1:1) meeting, when queried by Williams as to the sudden concern for impropriety (regarding his exemplary sales efforts) manager Cheryl Witt replied, " the incentive structure was not designed for someone to dominate it every single month...." It later became clear to that these managerial efforts were subsequent to William's application for a position elsewhere in the company - as there was no justifiable reason to thwart the transfer. Yet Human Resources never even granted the Plaintiff an interview for the posted position, despite being duly qualified.

29.     One day in March of 2009, Defendant Witt sought a pretextual opportunity for discipline with the 'sleep room incident.' Adamant that Williams and the Team's Lead started the workday before a time that manager Witt could commit (6:30 am - approved by the Team's Director, Brett Hanson), she overheard Williams asking a fellow co-worker to wake him up near the end of his lunch hour, in the sleep room. The sleep room is one of the designated facilities on company property for employees to take a nap, etc., if needed. As the co-worker was picking up the phone to ring Williams, manager Witt *intentionally* forbade the co-worker to ring the Plaintiff's phone and set him about on some task.

30.     As a result, Plaintiff Williams returned to his desk a couple hours later. Defendant Witt then tried to counsel Williams and as a punitive measure – mandated a new start time of 8:00 am or later. Manager Witt then rescinded the punitive measure, when reminded of her culpability in the matter.

31.     Ironically, the Clinical sales team had similar hours, yet endured none of the scrutiny reserved for Williams and the Team Lead. Soon after, Defendant Witt prevailed via V/P Donoghue, by citing a security policy reserved for the company's 'temporary' employees. However, Williams and the Team Lead had undergone conversion to permanent status in 2006.

*Complaint ~ 7*

32.    By April of 2009, upper-management had changed the Fitness team's commission structure for the new year. What is noteworthy is that no one on the Fitness sales team was able to make monthly goal in consecutive fashion (prior to the change), save for Williams. Why make the commission structure *more* rigorous, when no one except Williams was able to make goal every single month ?? Why use William's peak months during his (2008) sales run as the new threshold for 'goal' when the sales team had considerable difficulty meeting the former commission structure ??

33.    Rather than promote, management chose to punish Williams - at the team's expense. This action demoralized the Fitness sales team, including Plaintiff Williams; as the underlying reason for the change was obvious to all.

34.    Collectively, these actions bespoke a grim future for Williams and the Team Lead. And served as the impetus for a formal filing of protest with the Human Resources Director in mid-2009.

35.    The following chronology will highlight a smattering of the employer's retaliation against Plaintiff Williams not just for filing formal protest, but also upon utilizing his FMLA benefit, as afforded by state and federal law. Thus, the managerial response to the formal protest of discrimination included among other things, the following:

### *Retaliatory Animus*

JUNE 2009                                                        *Formal Protest*

36.    In June of 2009, Williams had (2) meetings with Human Resources Senior Director, Kristin Bragg. One meeting centered around concerns regarding the discriminatory treatment meted out by manager, Cheryl Witt (to date), towards Williams and the Team Lead. Examples of the sustained mistreatments were offered, to which Defendant Bragg promised to investigate and report back; which never happened.

37.    The second meeting had in attendance, Defendant Bragg, V/P John Donoghue, Nii Okunor (Team Lead), and Williams. The meeting was requested by Williams to both appeal and apprise. To further clarify, appeal in the sense that on its face, the only logical reason for changing the team's commission structure was to hinder the success of Williams. And to apprise in the sense of registering the team's sentiment and frustration with the new thresholds for commission (goal).

38.    Efforts by Williams and the Team Lead proved futile, as V/P Donoghue remained obstinate and maintained the new commission structure. This is noteworthy,

*Complaint  ~  8*

given that both the Team Lead and Williams submitted (3) alternative commission structures that either achieved comparable or superior business need; yet all three were summarily rejected.

OCTOBER 2009

39.    In October of 2009, during a (1:1) meeting manager Witt accused Williams of creating a 'hostile work environment' towards a fellow employee on the sales team. This was a falsehood. And especially poignant, given that in the days prior to the meeting, the manager received completely contrary feedback from the alleged victim (or employee), Team Lead, and Williams. In actuality, Defendant Witt had been in regular meetings with Defendant Bragg (in Human Resources) 'discussing' the issue. Nii Okunor, Team Lead, was apart of those discussions and brought them to the attention of Williams.

40.    Incidentally, in the same meeting Williams accused Defendant Witt of having *actually* created the 'hostile work environment,' and immediately scheduled a meeting with the H/R Director, Ms. Bragg to discuss the matter, but to no avail.

41.    Later that month, Defendant Donoghue (V/P) and Defendant Witt (manager) requested a meeting with Williams and cited a newfound "...communication issue that exists between me and my manager." As a result, Defendant Donoghue stated that he would be present at meetings, "... to mediate, yet will mostly be quiet." No other specifics or duration of time were provided. (October 26, 2009)

42.    On another occasion in October, a disciplinary meeting was scheduled regarding the issues of 'phone time and productivity.' However, later in the meeting manager Witt involved V/P Donoghue *directly,* by antagonizing Williams with questions that forced a change in his tonality or answers that Defendant Donoghue did not *agree* with. (October 29, 2009)

43.    In early November, Williams received an email from V/P Donoghue which cited that he "did not agree with my approach," with discussion eminent. The sentiment was in regards to a respectful request by Williams (to the Team's Director) to ensure that the administrative support team adhered to departmental policy; in the timely provision of a reporting tool used by the sales team.

44.    It is noteworthy that prior to June 2009, Williams had scant or little discourse with Defendant Donoghue (V/P), and never any communication by way of email. It was not an element of V/P Donoghue's demeanor (at least with anyone on the Fitness Team, ever) - not even during the sales run by the Plaintiff, mentioned earlier.

45.    In December of 2009, the company pocketed an unforeseen, unprojected windfall of $2+ million USD during the last (3) weeks of the year. This was due

*Complaint  ~  9*

largely to volatile market conditions **and** efforts by Williams in the state of Florida (his assigned state for sales). To briefly summarize, a health plan had shut its doors with no notice (Wellquest) leaving thousands of Medicare seniors with no network, in its wake.

46.    Williams was able to secure every high-profile account needed to assume the stranded network and posted an *unbroken production record* of (**181%**) of goal.

JANUARY 2010                                                                    *Investigation*

47.    In January of 2010, manager Witt instituted a series of *ad hoc* policies reserved for Williams and the Team Lead. For instance, upon review of William's new contracts responsible for the record production from December (181%), Defendant Witt saw fit to splash written criticisms (on the cover sheets) for <u>every</u> single inbound contract that Williams had obtained. This had never happened before, on either of her sales teams. The criticisms were inappropriate and irrelevant for any constructive purpose. Furthermore, this happened in full view of William's sales team.

48.    Mid-month, Defendant Witt had scheduled a 'routine' meeting to discuss campaign matters and other affairs. However, V/P Donoghue was also scheduled to be in attendance. Knowing the meeting to be clearly *pretextual*, Plaintiff Williams declined the meeting, contingent upon receiving clarification from the H/R Director, Defendant Bragg.  (January 15, 2010)

49.    Williams then emailed Ms. Bragg to query the purpose for the meeting. Defendant Bragg responded that Williams should ask V/P Donoghue for the meeting's purpose. Williams reminded the H/R Director of both her role and the Plaintiff's respectful practice of not asking Executive Team members why they do anything.

50.    Defendant Bragg then replied that it was to be an "issues meeting," (disciplinary) regarding phone time and productivity. Ironically, upon advising the H/R Director of William's (Dec) production record, the meeting was rescinded. The reasons in the email from Defendant Bragg were clearly *inconsistent* with the reasons manager Witt offered in her original email.

51.    Also noteworthy is the fact that Williams met with Defendant Bragg (in January 2010) to understand the rationale and science behind V/P Donoghue's posturing since October 2009 (present at meetings, etc.). In the meeting, Ms. Bragg said, "..We have 25 Vice-Presidents, I can't keep track of all of them.." Defendant Bragg also claimed that she, "..did not know that John was in attendance with any meetings," that involved Williams.

52.    Also, H/R Director Bragg was unable to provide a reason for V/P Donoghue's presence at meetings and specify for what duration of time. In turn,

*Complaint  ~  10*

Williams expressed his discomfort with what was clearly 'posturing' by the V/P, asked for it to stop, and held Ms. Bragg accountable for the misconduct. (January 2010)

53.     Later in January, 2010, manager Witt reassigned a substantial portion of William's prospective sales leads for no justifiable reason; especially given the prior month's achievement. "...Because you have too many," was the explanation given to Williams upon protesting.

54.     At the time, all team members had equal numbers of records, yet no other team member had to endure reassignments of this order, save for Williams and the Team Lead. In actuality, Defendant Witt had reassigned the records for fear of Williams breaking his own sales record (was on track to hit 200% of goal in spite of the mistreatment).

55.     Near the end of January, Nii Okunor (Team Lead) filed a formal grievance with the H/R Director for 'discrimination' against manager, Cheryl Witt. Williams was a central witness in the investigation. At no time during the investigation or after, were any restrictions or modifications placed on manager Witt's autonomy regarding decisions involving Williams or the Team Lead.

56.     Subsequent to the investigation, the Team Lead was physically relocated to a different department, yet still Team Lead. As for Williams, manager Witt ramped up the mistreatments as described herein. The conclusion of the investigation by Defendant Bragg yielded no evidence of discrimination by Defendant Witt; which in turn, was ratified by President and C.O.O., Robert White.

## MARCH 2010

### *Tad Nichols Incident*

57.     Manager Witt developed and uniquely applied *ad hoc,* the criterion that any of William's inter-departmental communications must be routed past her desk. This was problematic, given the Team's Director had appealed to William's efforts to do "whatever it took," to keep a certain provider (high-profile account) from leaving the company's Medicare networks (in fear of upsetting a major health plan client). By God's grace, Williams sought to not only rekindle the provider's interest in staying on board, but as a bonus - 'double' the provider's presence, in-network.

58.     In the week prior, the sales team had received training (on *Ashlink*) from Tad Nichols. As the Trainer / Claims Specialist, Mr. Nichols had stressed that he was available anytime for questions. Upon the conclusion of the training session, manager Witt indicated no qualms with Mr. Nichol's standing invitation at that time or after (verbally or written) to Williams, or the team.

*Complaint  ~  11*

59.    As final hours drew near to consummate the business with the provider, Williams felt it prudent to clarify a technical question related the new training; in order to preserve the account. Incredibly, manager Witt forbade Mr. Nichols to either answer or even speak to Williams despite arranging a meeting (via email) with Mr. Nichols just a couple of hours earlier.

60.    Upon walking over to his desk, Mr. Nichols recounted (in front of other employees in the department) manager Witt's instructions to Williams, as Team Lead Okunor registered the Plaintiff's dismay. Ironically, manager Witt was away from her desk the entire afternoon, save for the last (5) minutes before day's end.

61.    End result – the provider left the Medicare network, the company lost business, and Williams failed to make goal for the month.

### Harangued by H/R Senior Director and Manager

62.    Meeting in H/R Department which involved Defendants Bragg, Witt, and Williams. Purpose of the meeting was to offer 'constructive feedback' regarding (2) emails that had come to manager Witt's attention. During a (40) minute period, Williams was told by both Defendants that, "..some of your challenges come from using words out of context....You do not support your manager....does it bother you that we do not understand the words you use," and other inappropriate comments.

63.    The 'deficiencies' were labeled as (William's) communication issues and a link was made to "core competencies and interpersonal skills." Was also told that John Donoghue (V/P), Brett Hanson (Team Director), Ms. Bragg, and Ms. Witt, "...had discussed it and were appalled and annoyed." However, no disciplinary write-up was provided.  (March 11, 2010)

### Harangued again by H/R Senior Director and Manager

64.    Meeting in H/R Department which involved Defendants Bragg, Witt, and Williams. Purpose of the meeting was to offer 'constructive feedback' regarding (3) comments that Williams made during a team meeting the prior week. During this meeting, Williams was again severely harangued by both Defendants Bragg and Witt about his comments having a negative impact on the team's perception. Manager Witt then distorted the comments, to which Williams was not allowed to speak as both interrupted, continually.

65.    When Plaintiff Williams finally spoke to the comments despite interruptions, he was told by manager Witt that, "...the comments did not matter

*Complaint  ~  12*

anyway." Given that Williams was not afforded the opportunity to speak without the Defendant's interjections, the meeting ended shortly thereafter.  (March 18, 2010)

66.    Furthermore, Williams was told by Defendant Witt that the meeting was not 'disciplinary' in nature. This was in direct violation with the understanding agreed to by both Williams and H/R Director, Defendant Bragg. Meetings in the H/R Department were to be utilized only for disciplinary meetings, where 'pen meets paper.'

67.    As the random frequent meetings increased, the adverse health impact on Williams became evident and also detracted from daily recruitment efforts (job duties). Also, Williams had not agreed to the meeting arrangement.

APRIL 2010                                                             *FMLA Approval*

### *Todd Moseley Incident*

68.    A fellow co-worker in Provider Relations (PRL) had approached Williams regarding an assigned account for update and general follow-up. Williams remarked that he was unfamiliar with recent efforts and had not worked with the decision maker and the like. Upon further examination, the account was indeed in William's territory and available to recruit for the company's Medicare networks.

69.    For reasons unknown, the initial inbound call had been diverted to an 'ancillary specialist' (in PRL), in Todd Moseley. This employee was neither a management-level nor employed in a sales-capacity for the company. Yet, Mr. Moseley had elected to perform routine sales duties in lieu of Plaintiff Williams; result of which was the denial of recruitment credit and commission otherwise due to Williams (for accounts in his territory).

70.    Other PRL employees remarked the action was "very unusual," and not in accordance with departmental procedure. When asked for an explanation, Todd Moseley offered no reasonable answer and made haste to leave.

71.    In subsequent discussions with then PRL Supervisor, Rosia Bellamy, Williams was informed that manager Witt had directed Mr. Moseley to routinely 'target' William's inbound contracts.  (April 2010)

72.    FMLA was also approved during this month, for initial 'intermittent leave' of (27 – 32) hours per month. The unrelenting mistreatment by the Defendants had long since adversely impacted the health of Williams. By this time, the diagnosis was for among other things, <u>major recurrent depression</u> and <u>anxiety</u> (two 'serious' health conditions), for which *Xanax* and *Prozac* were prescribed concurrently. Plaintiff

Williams had initially consulted his physician in mid-2009 for medical diagnosis and regular treatment for the work-related maladies.

73.    The toll of the random, frequent meetings (emails, phone calls) by the Defendants and other members of the H/R Department was never ending. There was always some rebuke or punitive measure for the (once) top sales producer for the Fitness Team. In turn, as the mistreatments ramped up, so did the migraine headaches, irregular sleep patterns, stomach pains, nervous tics, and nightmares suffered by Williams. The physician had proffered the services of the Department of Psychiatry, to which Williams respectfully declined.


**MAY 2010**

74.    By this time, Defendants Bragg and Witt had begun to utilize the pattern of random frequent meetings, and emails to keep Williams in 'reactive mode,' and inflict emotional abuse. In a sales environment, the misconduct was a never ending distraction with purely malicious and punitive undertones. The adverse health impact was quite evident, given the recent approval for FMLA 'intermittent leave,' and frequent physician appointments. In addition, missed hours from previous pay periods were grandfathered in as approved FMLA absences; much to the chagrin of management.

75.    Manager Witt's campaign to isolate Williams from other teammates was incessant, and wanton regarding the Team Lead, Nii Okunor. On this occasion, manager Witt rounded the corner and upon seeing Williams conversing with said colleague Okunor (about recruitment efforts), shouted in belligerent fashion within earshot of three departments

"...Look, Hey It's A Party !!! "

76.    At that moment, one of the two (African-American) new hires, Ashley Osborne, happened to be walking by exchanging morning greetings with Williams and the Team Lead as well. Nevertheless, everyone within earshot registered the offense and was appalled (signed written account by Brian Faision, Ashley Osborne, Chris Merto, Nii Okunor, and Plaintiff Williams on May 5, 2010).

77.    President and C.O.O., Robert White was notified of the offense (by the Team Lead), yet no action was taken against manager Witt, who had been labeled in writing and verbally by H/R as having a 'communication issue.' Furthermore, upon information and belief, Williams maintains that manager Witt never received any training for said *communication issue* by Human Resources.

*Complaint  ~  14*

78.     Also in May 2010, Defendant Witt had begun her occasional practice of intentionally miscoding William's (FMLA) absences with the company's payroll department. This would happen periodically, for the remainder of his tenure with the employer, Defendant ASH.

JUNE 2010

79.     By this time, manager Witt tried unsuccessfully to coerce Williams into meeting for an annual review of the (2008 – 2009) year during a scheduled (1:1) meeting. Williams declined the meeting, and formally protested in an email to H/R Director Bragg; explained that it was unfair to him and manager Witt, to expect the manager to have newfound objectivity by which to conduct an impartial annual review. Bear in mind, it was during this same period that Defendant Witt had falsely accused Williams of creating a 'hostile work environment.' Ms. Bragg relented, in part.

80.     An annual review was conducted for William's (2008-2009) year. In attendance were H/R Director Bragg, V/P Donoghue, Team Lead Nii Okunor, and Williams. It had been decided that (in light of protest by Williams), H/R Director Bragg and V/P Donoghue would deliver the annual review on behalf of manager Witt; who had written the document. Needless to say, the review was filled with inconsistencies and falsehoods that painted Williams in a less than favorable light. Also noteworthy is the fact that the only two employees on the team to receive an annual review in mid-2010 for the (2008-2009) year were Williams and the Team Lead.

81.     As an aside, on the advice of the DFEH Consultant who *initially* processed William's discrimination complaint (not the one at-issue, for criminal misconduct), the suggestion was made to have an 'advocate' present at every disciplinary meeting involving Williams and management. Begrudgingly, the company relented and Team Lead Okunor served in such capacity, until William's date of termination from the employer.

JULY 2010

82.     A common occurrence was for manager Witt to criticize or harass, Williams upon return from an 'FMLA-approved' absence; in a (1:1) meeting under the guise of an 'update.' In this instance, manager Witt proceeded to query William's progress regarding the "*Windsor Expansion Campaign*," and demanded that Williams initiate (immediate) recruitment or face disciplinary action.

*Complaint ~ 15*

83.    Aside from knowing that the team had yet to begin initial calls, Williams reviewed the call list, and identified the ruse. The following Tuesday, at the team meeting, Williams asked Director Brett Hanson to confirm that the relevant health plan was not even *licensed* to conduct business in the states for which Williams was assigned (5 pages or 100+ pointless calls). Manager Witt backpedaled and in effect, was muted by the team's frustration. The campaign vanished soon after, however the manager's retaliatory treatment did not.

84.    Another facet of the retaliation often included 'heightened managerial surveillance.' On this particular occasion (having a brainstorm about a recruitment issue), Williams asked Team Lead Okunor, to accompany him to the foyer outside the department to discuss the idea. Nevertheless, managers Witt and Sue Skinner, took the opportunity to make it emphatically clear that they were not pleased with William's behavior; aside from walking a perimeter <u>around</u> Williams and the Team Lead.

85.    Upon returning to his desk, as expected, was a written rebuke from manager Witt (email). Having defused the manager's disciplinary effort (and tendency to fabricate anything material), after an hour passed both Williams and the Team Lead noticed (2) groups of fellow team-members from manager Witt's sales teams in the foyer, talking well in excess of twenty minutes. Ironically, this was in full view of both managers Witt and Sue Skinner.

86.    In spite of the retaliation, occasionally Williams was able to achieve production goal; much to the displeasure of manager Witt. Having achieved goal for the month of July, manager Witt was adamant – as it rendered her summer's worth of 'Performance – Improvement - Plans' for naught. As a result, she 'forgot' to include William's name on the congratulatory email, distributed to both departments. This had never happened before/since, and manager Witt was held accountable by her other team's members.


## AUGUST 2010

87.    On this occasion, manager Witt was intentionally eavesdropping on a conversation between Williams and Team Lead Okunor, in reviewing the prior day's events due to an excused FMLA absence. Indignant, manager Witt accosted Williams in front of several teammates, and demanded for him to query any missed activities instead through her. Williams politely declined, and reminded manager Witt that for nearly ~ (5) years, his colleague is 'cued in' to what Williams needed to know to be productive and the like.

*Complaint ~ 16*

88.     Furthermore, manager Witt had begun to use the (1:1) meeting times to antagonize, rather than offer helpful or truthful information. Dissatisfied with his answer, manager Witt called Williams into a conference room to berate and provoke him to anger. Unsuccessful with the latter, and frustrated with William's resolve to avoid dialogue unless absolutely necessary, Williams finally took his leave only to field 'why' questions from his teammates.

89.     Also during August, Defendant Witt had resolved to strip Williams of all applicable production credit towards goal; which amounted to a (0) for production that month, a stark contrast to the Plaintiff's performance just 12+ months earlier. Misconduct by manager Witt included noting some of William's accounts with inaccurate information; which conveniently served as a precursor for later disciplinary action (file-padding).

90.     By this time, manager Witt had begun the practice of standing (1:1) meetings every Friday, during the last hour of William's workday. Meetings to distract and frustrate the recruitment efforts by Williams.

91.     Later in August, Williams was summoned to H/R for a meeting by Jessica Zaldivar (Employee Relations Specialist) with the Team Lead in attendance (as advocate). On this occasion, Williams was interrogated and falsely implicated in a scandal affecting an adjacent department.

92.     *Pretextual conditions* clearly existed – as the intent was to expedite his discharge from the fabricated testimony of someone Williams had spoken to <u>once</u> during his entire tenure. Botched attempt then became an amateurish fishing expedition, to save face. Williams indicated to Ms. Zaldivar that he would not be "..party to any gossip, whether it be on or off company premises."

93.     In a different (unwarranted) incident, Plaintiff Williams was placed on a (Final) Written Warning by H/R Director Bragg and V/P Donoghue.


<u>SEPTEMBER 2010</u>                          *ASH Receipt of DFEH Complaint*

94.     On a quarterly basis, H/R Director Bragg had been kept apprised of the ramped up misconduct on the part of all relevant management-levels. On more than one occasion did Williams offer empirical evidence to Defendant Bragg to corroborate the allegations described herein. Given the growing adverse health impact and waning effect on monthly production, Williams merely wanted manager Witt to allow him to do his job unencumbered; but to no avail.

95.     In September, Williams updated Defendant Bragg again, regarding the unrelenting mistreatment received from manager Witt. Itemized major examples of misconduct, and Defendant Bragg's culpability in an email.

96.     Also during the month, Williams appealed directly to manager Witt for relief (email); given the cumulative effect of the random, frequent meetings and emails. (September 7, 2010)

OCTOBER 2010

97.     Rescinded meeting with H/R Director Bragg as it became evident that imploring upper-management to curtail the unlawful mistreatments was utterly futile. (email)

NOVEMBER 2010                                      *Nervous Breakdown*

98.     Topical example of manager Witt's incessant efforts to use emails and administrative minutia, as veiled attempts to frustrate William's workday. As the stress and anxiety continued to mount, Williams expressed that he would contact H/R regarding FMLA, as further mistreatment continued to impinge upon daily production efforts (email, November 15, 2010).

99.     Random reassignments again. On this occasion, manager Witt waited until William's final round of discussions to retain existing (high-profile) providers to invoke the *ad hoc* policy, reserved *only* for Williams and Team Lead Okunor. The accounts, originally brought on board by Williams, were needed by the company to retain lucrative health plan contracts.

100.    The reassignments constituted a sizeable block of William's business – *gone;* which left few viable prospects to recruit, as year's end was approaching. The action was William's punishment, for having to utilize (FMLA) time away from desk. To further underscore Defendant Witt's malice, she even reassigned (new) clinical contracts that Williams had recently brought in – that were already 'in hand,' a *direct violation* of departmental policies. The workload represented the culmination of over two month's work, recompense aside; and of course, it signposted William's eminent discharge.

101.    Furthermore, manager Witt attempted to wield Williams being on 'Final Written Warning,' to recast the illusory notion that she was doing everything possible to provide a favorable environment (conducive to William's recruitment efforts). Also,

*Complaint   ~   18*

copied in the email were H/R Director Bragg and V/P Donoghue. In turn, Williams provided a more accurate summary, that reviewed the accountabilities of all (4) parties.

102.   Soon thereafter, the racially motivated 'hostile work environment,' took its toll, and shattered William's emotional, mental, and physical armor; which rendered his inability to work for several days (FMLA absences). At this point, William's physician was alarmed by changes in his patient's physical, emotional / mental health, and insisted that Williams begin psychiatric counseling with no further delay.

103.   In addition, the physician admonished the company about the effect of missed work/hours, leading to diminished productivity; which in turn, legitimized William's rationale for effective 'reasonable accommodation;' which was never formally attempted by ASH. The company was made privy to William's treatment for *severe depression'* and *'anxiety;'* which Williams intimated was caused primarily by manager Witt's sustained mistreatment, in a prior H/R meeting. {Written advisement from physician}

104.   Plaintiff Williams maintains that he had exhausted efforts at dialogue with H/R to consider effective reasonable accommodation. Despite having tried to engage an interactive process with the employer, the only responses were vague statements and empty rhetoric. In addition, Williams asserts that further investigation and discovery will yield examples of (Caucasian) employees who had neither work-related injuries nor FMLA status, but were allowed to work from home while coping with their medical problems.

105.   On November 15, 2010, Kathleen Resch (H/R) summoned Williams to a meeting in H/R to interrogate and determine what prompted William's physician to provide the recent written advisement which solidified that 'missed days of work = diminished productivity.' Williams found the questions to be awkward and not in alignment with his understanding of appropriate (FMLA) questions allowed by an employer.

DECEMBER 2010                                                    *Termination*

106.   (1:1) meeting where Williams held manager Witt, _directly_ accountable for her sustained mistreatment which stifled his productivity, hindered any discourse with Team Lead Okunor, and consistently provided inaccurate information. Manager Witt asked Williams when he was leaving, at 4:24pm that day; adamant that he was transcribing notes from the meeting, 'off-the-clock.'

107.   On several occasions throughout the year, manager Witt had miscoded William's FMLA-approved absences. Initially, Williams thought nothing of it – yet disliked having a second check drafted, inconvenienced for the oversight. By the third time however, Williams became mindful and urged manager Witt to be more diligent.

108.   The trend continued periodically, at which point Williams apprised the (FMLA) H/R rep, Kathleen Resch. Furthermore, payroll had become frustrated with the oversights as well, as evidenced in emails (email, December 3, 2010).

[FINAL UPDATE]

109.   Williams issued an update to H/R Director Bragg to reaffirm the retaliatory mistreatment that was unrelenting and unabated, despite his provision of timely reports to members of upper-management, namely Defendants Bragg and Donoghue. (email, December 7, 2010)

DISCHARGED

the following day, with an *ad hoc* radio-laden security team that consisted of regular company employees, which badgered and escorted Williams to his vehicle.

110.   This is noteworthy in that the company had relocated north of San Diego, to a property that has on-site security. Furthermore, Williams had not committed any criminal offense and the aggressive security detail happened in front of the Plaintiff's coworkers.

111.   And ironically, Williams was discharged after declining mediation due to a last minute change of venue; from the DFEH approved facility of Loma Linda University, to offices of general counsel for *American Specialty Health.* Williams had declined mediation subject to appointment of a more appropriate venue. Summarily discharged (3) hours later. (December 8, 2010)

## VI.   ALLEGATIONS

112.   California Courts have recently held that in situations where an extended duration of time exists between the protected activity and adverse action, the causal nexus can still be established in lieu of temporal proximity. Put differently, if between the two events is an emerging pattern of animus consistent with retaliatory intent, then the causal nexus is established. [2]

---

2 *Wysinger v. Automobile Club of Southern California* (2007), 157 Cal.App.4th 413

*Complaint  ~  20*

113.   Plaintiff Williams maintains that:

(a)   he engaged in protected activities, namely filing a formal complaint with H/R, participation in an internal investigation against manager Witt for discrimination, and a DFEH administrative complaint filing for discrimination.

(b)   he was subjected to the litany of adverse employment actions described herein, up to and including termination.

(c)   as a result of the initial formal protest and regular 'updates' of the unlawful and egregious misconduct, the employer responded in turn with the adverse employment actions hallmarked by (6) pivotal dates. These turning points included the months of June 2009, January, April, September, November, and December 2010. Retaliatory mistreatment that served as adverse employment actions, by the 'totality of circumstances.'

Furthermore, the Defendants were aware of the Plaintiff's participation in the protected activities, given their respective positions as management-levels.

114.   "There is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging injuries." In determining whether an action by the employer will support actionable retaliation, courts will consider the totality of the circumstances. "[T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." [3]

115.   Under the relevant FMLA statutes (interference), Plaintiff Williams maintains that Defendant Witt willfully interfered with his ability to take FMLA leave by:

(a)   making inappropriate comments upon his return from FMLA-approved absences (complaints).

(b)   conducting punitive meetings disguised as 'updates' following FMLA absences. Misconduct during these meetings often included the provision of inaccurate and untruthful information coupled with disciplinary overtones.

---

[3] *Yanowitz v. L'oreal USA, Inc.* (2005), 36 Cal.4th 1028 at 1052.

*Complaint  ~  21*

116. In addition, Plaintiff Williams asserts that he was retaliated against by the Defendants for taking FMLA-approved leave by:

    (a)   reassignment of his records.

    (b)   the intentional miscoding of FMLA hours by manager Witt.

    (c)   inappropriate questions about his FMLA status.

    (d)   creating ramped up performance standards to oppress, frustrate the Plaintiff's sales production, and inflict emotional abuse.

    (e)   heightened managerial surveillance

117. Regarding 'defamation,' Plaintiff Williams maintains that he suffered the following mistreatment by the Defendants:

    (a)   inter-departmental defamation of the sort described herein.

    (b)   an inaccurate (or negative) performance evaluation.

    (c)   upon wrongful, or retaliatory discharge. The termination was under false premises and subsequently published in the Plaintiff's personnel file, which is accessible to others. Furthermore, Plaintiff Williams has suffered injury to his profession and reputation.

118. In alignment with recent Court of Appeals decisions, Plaintiff maintains that the ASH arbitration agreement is invalid because:

    (a)   it was a contract of adhesion, or condition precedent to employment at ASH.

    (b)   it did not include a (16) page copy of the rules associated with the JAMS arbitration.

    (c)   at no time was the Plaintiff given a link or made aware of the rules for the JAMS arbitration process.

    (d)   the agreement is cost-prohibitive for the Plaintiff in pursuit of justice (unconscionable). [4] [5]

119. "Because the time limitations set forth in Title VII are not jurisdictional, they may be modified by equitable concerns, such as tolling." [6]

120. Defendant ASH has engaged in a broader series of misconduct beyond the scope of this Complaint; namely for collusion with state and federal agencies regarding this matter. Plaintiff Williams asserts that

---

4 *Mayers v. Volt Management Corp.* (Cal.Ct.App., Feb. 27, 2012 G045036)
5 *Wisdom v. AccentCare, Inc.* (2012), 202 Cal.App.4th 591
6 *Oshiver v. Levin, Fishbein, Sedran, and Berman* (3d.Cir 1994), 38 F.3d at 1387

Defendant ASH participated directly or indirectly, in a pattern of racketeering activity that deprived Plaintiff Williams of his fundamental 'right of access' to the Courts.

121.   "Whereas equitable tolling allows a plaintiff to avoid the bar of the limitations period if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." [7]

122.   Despite adherence to all DFEH procedures, the DFEH is unwilling to issue the needed closure letter or 'right-to-sue,' for retaliatory animus in the matter. The complaint was filed on December 8, 2011 by the Plaintiff with the state agency. To date, both the DFEH and EEOC have engaged in a pattern of unlawful activity which included *inter alia*, mail fraud, honest services fraud, anticipatory obstruction of justice, and extrinsic fraud.

123.   As a result all (3) entities find themselves under investigation by agencies upon suggestion of the United States Attorney's Office, Central District of California, as of August 2012.

124.   While trying to obtain the *retaliation* 'right-to-sue' letter, the Plaintiff's *discrimination* 'right-to-sue' letter expired. Had the DFEH issued the retaliation closure letter, Plaintiff Williams would have had until December 8, 2012 to bring cause of action in a judicial venue.

125.   As such, it is only appropriate that the doctrine of 'equitable tolling' be applied in this matter.

126.   "There are three principal situations in which equitable tolling is appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action, and that deception causes non - compliance with an applicable limitations provision; (2) where the plaintiff in some extraordinary way has been prevented from asserting his rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." [8]

---

7 *Smith-Haynie v. District of Columbia (D.C. Cir. 1998)*, 155 F.3d 575, 579

8 *Oshiver*, 38 F.3d at 1387 (citing Sch. Dist. of City of Allentown v. Marshall, 657 F.2d 16, 19-20 (3rd Cir. 1981)

# VII.  FIRST CAUSE OF ACTION

{Violation of  2 U.S.C.  § 1311}
{Anti–Retaliation Provision}

### Retaliation

(Against ALL Defendants in their official capacities)

127.   Plaintiff incorporates by reference and realleges paragraphs 1- 126 of this Complaint.

128.   Defendants Bragg, Donoghue, Witt, and ASH willfully retaliated against the Plaintiff by way of the ongoing pattern of unlawful misconduct described herein, in violation of Title VII, the 'Anti-Retaliation Provision.'

129.   The misconduct by the Defendants was sustained, egregious, and applied methodically to subject the Plaintiff to adverse actions up to and including, wrongful discharge.

130.   Repeated violations of the federal statute subjected the Plaintiff to financial harm, emotional distress, mental pain, humiliation, and embarrassment. The misconduct by the Defendants was the direct and proximate cause of the Plaintiff's injuries.

# VIII.      SECOND CAUSE OF ACTION

{Violation of  FMLA 29 U.S.C.  § 2615(a)(1)}

### FMLA Interference

(Against Defendant Witt in her official and individual capacities)
(Against Defendants Bragg, Donoghue, ASH ~ official capacity)

131.   Plaintiff incorporates by reference and realleges paragraphs 1- 130 of this Complaint.

132.   29 U.S.C. § 2615(a)(1) provides that:

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

*Complaint  ~  24*

133.   Defendants Bragg, Donoghue, Witt, and ASH willfully interfered with the Plaintiff's exercise of his FMLA benefits by way of the ongoing pattern of unlawful misconduct described herein, in violation of Family Medical Leave Act, 29 U.S.C. § 2615(a)(1).

134.   The misconduct by the Defendants was sustained, egregious, and applied methodically to subject the Plaintiff to adverse actions up to and including, wrongful discharge.

135.   Repeated violations of the Federal statute subjected the Plaintiff to financial harm, emotional distress, mental pain, humiliation, and embarrassment. The misconduct by the Defendants was the direct and proximate cause of the Plaintiff's injuries.

## IX.        THIRD CAUSE OF ACTION

{Violation of  FMLA 29 U.S.C. § 2615(a)(2)}

FMLA Retaliation

(Against Defendants Witt, ASH ~ official capacity)
(Against Defendants Bragg, Donoghue in their official and individual capacities)

136.   Plaintiff incorporates by reference and realleges paragraphs 1- 135 of this Complaint.

137.   29 U.S.C. § 2615(a)(2) provides that:

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

138.   By way of the ongoing pattern of unlawful misconduct described herein, Defendants Bragg, Donoghue, Witt, and ASH retaliated against the Plaintiff for his exercise of FMLA benefits, in violation of the Family Medical Leave Act, 29 U.S.C. § 2615(a)(2).

139.   The misconduct by the Defendants was sustained, egregious, and applied methodically to subject the Plaintiff to adverse actions up to and including, wrongful discharge.

140.   Repeated violations of the Federal statute subjected the Plaintiff to financial harm, emotional distress, mental pain, humiliation, and embarrassment. The

misconduct by the Defendants was the direct and proximate cause of the Plaintiff's injuries.

## X.    FOURTH CAUSE OF ACTION

{Violation of FEHA § 12940(h)(i)}

Retaliation

(Against ALL Defendants)

141.   Plaintiff incorporates by reference and realleges paragraphs 1- 140 of this Complaint.

142.   By way of the ongoing pattern of unlawful misconduct described herein, Defendants Bragg, Donoghue, Witt, and ASH willfully retaliated against the Plaintiff, in violation of the Fair Employment and Housing Act § 12940(h)(i).

143.   The misconduct by the Defendants was sustained, egregious, and applied methodically to subject the Plaintiff to adverse actions up to and including, wrongful discharge.

144.   Repeated violations of the California statute subjected the Plaintiff to financial harm, emotional distress, mental pain, humiliation, and embarrassment. The misconduct by the Defendants was the direct and proximate cause of the Plaintiff's injuries.

## XI.    FIFTH CAUSE OF ACTION

{Violation of California Labor Code § 1102.5(b)}

Retaliation

(Against ALL Defendants)

145.   Plaintiff incorporates by reference and realleges paragraphs 1- 144 of this Complaint.

146.   California Labor Code § 1102.5(b) provides that:

An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable

*Complaint  ~  26*

cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

147.   By way of the ongoing pattern of unlawful misconduct described herein, Defendants Bragg, Donoghue, Witt, and ASH willfully retaliated against the Plaintiff, in violation of the California Labor Code § 1102.5(b).

148.   The misconduct by the Defendants was sustained, egregious, and applied methodically to subject the Plaintiff to adverse actions up to and including, wrongful discharge.

149.   Repeated violations of the California Code subjected the Plaintiff to financial harm, emotional distress, mental pain, humiliation, and embarrassment. The misconduct by the Defendants was the direct and proximate cause of the Plaintiff's injuries.

# XII.        SIXTH CAUSE OF ACTION

{Violation of California Civil Code § 43}

Defamation

(Against ALL Defendants)

150.   Plaintiff incorporates by reference and realleges paragraphs 1- 149 of this Complaint.

151.   By way of the ongoing pattern of unlawful misconduct described herein, Defendants Bragg, Donoghue, Witt, and ASH subjected the Plaintiff to defamation, in violation of the California Civil Code § 43.

152.   The misconduct by the Defendants was sustained, egregious, and applied methodically to subject the Plaintiff to adverse actions up to and including, wrongful discharge.

153.   Repeated violations of the California Code subjected the Plaintiff to financial harm, emotional distress, mental pain, humiliation, and embarrassment. The misconduct by the Defendants was the direct and proximate cause of the Plaintiff's injuries.

# XIII.   SEVENTH CAUSE OF ACTION

{Intentional Infliction of Emotional Distress}

(Against ALL Defendants)

154.   Plaintiff incorporates by reference and realleges paragraphs 1- 153 of this Complaint.

155.   Defendants' misconduct detailed herein was egregious, malicious, and unconscionable.

156.   The misconduct was intentional and apathetic to the Plaintiff's exercise of his rights, as afforded by state and federal law. Mental pain, humiliation, and emotional distress were the direct and proximate result of the Defendants' misconduct described within this Complaint.

157.   In addition, the Defendants operated with the full knowledge and intention to suffer the Plaintiff harm via emotional distress, anguish, humiliation and other damages.

# XIV.   EIGHTH CAUSE OF ACTION

{Negligent Infliction of Emotional Distress}

(Against ALL Defendants)

158.   Plaintiff incorporates by reference and realleges paragraphs 1- 157 of this Complaint.

159.   Defendants' misconduct detailed herein was methodical, malicious, and wanton. As such, it was reasonably foreseeable that the Defendants' misconduct would cause emotional distress and humiliation to the Plaintiff.

160.   Furthermore, the Defendants were indifferent to the Plaintiff's exercise of his rights, as afforded by state and federal law. Mental pain, humiliation, and emotional distress were the direct and proximate result of the Defendants' misconduct described within this Complaint.

## XV.         NINTH CAUSE OF ACTION

### {Declaratory Relief}

161.   Plaintiff incorporates by reference and realleges paragraphs 1~ 160 of this Complaint.

162.   At issue, is the incredulous pattern of retaliatory misconduct exercised by the Defendants Witt, Bragg, Donoghue, and ASH in the matter described herein.

163.   As such, the unlawful misconduct constituted adverse actions by the 'totality of circumstances.' In a broader sense, Defendant ASH also conspired with these Defendants and other parties to punish and deprive the Plaintiff's exercise of rights as assured by numerous state/federal laws and both Constitutions.

164.   Thus, Plaintiff Williams respectfully seeks a judicial declaration affirming that the Defendants retaliated against the Plaintiff for his exercise of statutory rights, as afforded by relevant state and federal laws.

## XVI.         PRAYER

WHEREFORE, in this matter involving the Defendants both jointly and severally, the Plaintiff prays that the Court will:

1.       Issue a declaratory judgment that the Defendants' unlawful misconduct was retaliation against the Plaintiff for his exercise of statutory rights, as afforded by relevant state and federal laws.

2.       Provide injunctive relief to ~

(a) prohibit the Defendants from exercising policies and practices, informal or otherwise, that interfere with an employee's right to register formal protest with discriminatory activities;

(b) implement an *effective* grievance procedure to address and curtail problems of the sort described herein (in lieu of one in 'name only');

(c) establish disciplinary protocols for management-levels who subvert company directives;

3.       Award to the Plaintiff, in an amount to be proven by Trial, exemplary damages against all Defendants sued in their official and individual capacities.

4.       Award to the Plaintiff, any statutory damages and penalties pursuant to California Civil and Labor Codes named herein.

5.       Award to the Plaintiff, in amounts to be proven by Trial, compensatory and general damages against the Defendants, and each of them.

*Complaint  ~  29*

6.      Award to the Plaintiff, in amounts to be proven by Trial, front pay, liquidated damages, and aggravated damages against Defendant ASH.

7.      Award to the Plaintiff, his costs, expenses, for time spent doing judicial research, and case preparation pursuant to California Code of Civil Procedure § 1021.5; and

8.      Respectfully grant such other and further relief as the Court may deem just and proper.

## XVII.      DEMAND FOR JURY TRIAL

Plaintiff Williams hereby respectfully requests a jury trial on all issues so triable.

Dated: December 28, 2012

*Kelton M. Williams*

By: Kelton M. Williams

Plaintiff in Pro Per